We turn now to the third case of the day. It's Appeal Number 22-2189, Meredith Dawson v. Great Lakes Educational Loan Services, Incorporated, et al., and we welcome Mr. Harris. Good morning, Your Honors. May it please the Court, I'm David Harris. I'm here on behalf of Meredith Dawson and the class of approximately 136,000 federal student loan borrowers, including the approximately 1,600 borrowers who were decertified at final judgment. I'd like to begin by just highlighting that it would be difficult, if not impossible, for me to distill seven full years of litigation and all that occurred over two full rounds of complex class certification, three full rounds of complex summary judgment proceedings, including cross motions in the third round. It would be hard for me to address all of that in the short time we have here today. We've addressed the issues that we believe are most material to this appeal in our papers, and I would just respectfully ask that, to the extent I don't get to certain issues in the papers today, that the Court simply rely on our briefing in its entirety. Mr. Harris, our time is a little short, so I wonder if I could just start with some questions. Sure, absolutely. So we have, with regard to the damages and whether or not the defendants adequately mitigated all of plaintiff's damages, I understand that there are damages associated with the initial, what I will call erroneous capitalization, and then there are these adjustments, right? There are two kind of adjustments that were made. One as a result of the change request 2782 that resulted in the increase for some of the balances of some of the class members, and then the other one was a interest subsidy that had to be backed out. Okay? With me so far? So aside, and I know that there was a lot of paper in the Court below about whether or not the plaintiffs are entitled to, as damages, one of the adjustments that resulted in greater increase in their balance from zero to some other balance, right, due to the application of change request 2782. Putting that aside, putting those adjustments aside, does plaintiff believe, is it your position that the remediation projects did remove or address the errors that came from the capitalization, the erroneous capitalization? Thank you, Your Honor. So the answer to your question depends on how we frame the law. But before we talk about, you know, our view of the facts, we have to talk about what does it mean for the capitalization transaction to be removed from the account? I think that's what Your Honor is asking. Is that correct? Right, because originally, as I understand it, the defendants, I'll just refer to them collectively as Great Lakes, right? As I understand it, originally they were thinking about just backing out the interest from the capitalizations, right? And then, and I'll talk to them about this, for some reason they decided they needed to rebuild the accounts. And the rebuilding triggered the two additional adjustments, right? And so if they had just backed out the interest from the erroneous capitalizations, would that have addressed all of the damages to the plaintiffs from the erroneous capitalization, if they had gone that route? The effect of that would have been to redress all of the damages, but I'd like to qualify that statement. The reason it would have addressed the damages is because that would have necessarily resulted in a financial benefit to the class members who were financially harmed at the time of this court. Right, because it would have put them back in the position before the erroneous capitalization. Right, but however, even if that happened, we would still have this collateral source issue that we raised. No, I understand that, but I'm just talking about the issue of the damages. So then your argument is that because of this application of change request CR 2782, the balances of some class members increased, right, like 16,000 or so? So, Your Honor, that's actually not our position, but that's Great Lakes' position. And that position is actually not properly, was not actually properly before the district court, and here's why. There was no legal argument ever made that this change request 2785 was actually what it was, had these requirements as a part of the loan. And there was no legal argument. The experts, Great Lakes brought five experts before the district court, and none of them opined that change request 2785 had these requirements in it. And even if they had done that, the district court held on its Daubert motion, on its Daubert order, which was docket 383 below, it said our expert couldn't opine on the meaning of the government's loan servicing requirements because that's a legal issue and it's a non-lawyer. I guess what I'm trying to wrap my head around, and perhaps in a very kind of circumstantial way, is there are only a small, there are a subset of class members that suffered from this increase in their balance, right? And if that's the case in the class, and the class period is from 2006 to something like February of 2019 or at the latest, right? So if we're looking at trying to figure out damages, and we were remanding to the district court for damages, wouldn't that also open the question of whether or not there has to be additional subclasses or whether or not the class definition needs to be modified to address those additional adjustments? I would say no, Your Honor. Again, because that assertion that CR 2785 caused what actually happened with the deaths is not before the court. It's a factual assertion, and that assertion was an assertion of opinion. So what happened factually, and it's undisputed. But is that something that the plaintiffs contested in the district court, that the increases was a result of the application of CR 2782 when the accounts were rebuilt? No, Your Honor. We didn't expressly contest it because we didn't feel we needed to legally. So I understand that Your Honor is trying to get a sort of interplay between damages and these other adjustments that purportedly caused the deaths to be whatever they are today. Our view of these other adjustments that came in the middle of the lawsuit contemporaneously with the purported backing off of the originally challenged transactions, our position is that those have nothing to do with our theory of damages in the case. So our theory of damages in the case is that Great Lakes imposed these transactions historically. Between approximately 2010 going through 2015 to the point of filing the lawsuit, they were imposing these transactions on the accounts. Can I use a demonstrative just briefly? It's nothing significant really. It's just to give a picture. Has the other side seen it? No, but I can show it. They've seen something like it over and over again. I would think that would be. Is this something in the record? It is in the record, Your Honor. I can't tell you exactly where. It's not in our appendix, but it was early in the case. So what are the transactions at issue? What are they? So eight years ago, Ms. Dawson gave me this document, and it's her transaction history. It just shows her payments and her balances on different dates. And on this list of payments, eventually, is the capitalization transaction that we challenged. Legally, what is this? What is this transaction that's provided in the history of the loan? Is that harm? Is that damage? And I would assert that the answer is no. I would assert that what this is legally, this transaction record, is it's a record of it's circumstantial evidence of negligence. If it's not harmful, what are we doing here? So it's a business record that shows that they were negligent historically. Sorry. What's the harm? So the harm is what we lay out in our proposed findings of fact during summary judgment round two, and it's at the short appendix, which is at page SA407. And what the proposed findings of fact there show is that what Great Lakes reports to the credit bureaus, et cetera, I could go on, National Student Loan Database, you name it, they have a direct line to the federal government's general ledger. And what they report to the general ledger in real time on a daily basis is the total debt. It's the loan balance. At the moment this happens, this transaction happens historically, the loan balance doesn't actually increase. I still have the same debt the day that a capitalization transaction occurs. My injury is not by the type of interest that accrues. It's not by the way the debt is calculated. Great Lakes could negligently calculate the debt in a way that helps me. And in fact, that's what they say they did with these other adjustments. They're saying historically we were... Mr. Harris, I'm waiting in suspense for you to answer what it is. What is the harm? The harm is the increase in my debt. It's the federal government having on its general ledger a larger number than it would otherwise have but for the way that that was calculated. Okay. And the defense has come forward with, in particular, Mr. Bankhead and his team's study for the effects of the remediation projects and with the different categories of borrowers. What do you have that actually disputes their conclusions about the sufficiency of the remediation projects? So factually disputed, we have deposition testimony from one of the experts and I don't have the docket number in my head but you may recall the order of the court shortly before the third round of summary judgment where Judge Peterson said, look, I see that they have these expert reports now. How do you plan to address these at trial? You say that's unfair but I understand why the district judge would insist on that. And I'm trying to ask you the same question today. Sure. And so in response to that order, we set out briefly in like a four-page argument that we had deposition testimony from one of the experts showing that he conceded that on some of the accounts he reviewed, the transactions were still there. And so my co-counsel deposed him and said, hey, so if you extrapolate this out from your statistical sample. Was that before Bankhead's final report? Because there were some exceptions, correct? The deposition occurred between the time of the initial report and the quote unquote supplemental report. Right. Yes. Okay. So dispute the supplemental report. We haven't done that, Your Honor. Okay. Thanks. Actually, we would say legally it's inconsequential. And the reason is these three expert reports collectively only purport to show one thing, that the transactions are no longer part of the debt calculation. They do not purport to show that the plaintiffs are in as good of a financial position as they would have been in had the transactions not been imposed for many years. And so what the law requires very clearly is that the plaintiff be put in as good of a position as they would have been in had the negligence not occurred. And Great Lakes comes in and says, okay, well, we haven't done that. We haven't put them in as good of a financial position as they would have been in had the negligence not occurred. But the reason is we had to make these other adjustments. Sorry. We don't have to show that they're correct. Instead, we're just asserting that you owe more money for other reasons. And we're going to call you net undamaged from the conduct alleged in this case based on our essentially counter allegations against you that were never pleaded. But there's no factual dispute about this? You're saying they're irrelevant. I understand that. No factual dispute about the other adjustments? Yes. The only factual dispute would be as to admissibility of the assertion that they exist. And so I'm just really curious when you said earlier to Judge Lee that this, you know, the increase has nothing to do with your theory of damages. So then, in effect, you don't care about this extra 6.6 million that has now been introduced into the case. So I may have misheard, Your Honor. But what I thought I just heard was that the damages have nothing to do with . . . Judge Lee was asking about the increases to some of the borrower's accounts because of the other adjustments the Great Lakes alleges it had to make because of change regulations of the Education Department. You said, you responded, this has nothing to do, that whole thing has nothing to do with our theory of damages. Right. So my question is, do you actually care about this extra 6.6 million that is apparently the result of that? The short answer is no. However, we would still maintain that we're entitled to the debt increases that we suffered as a result of the negligence. Because our debt was increased, because we overpaid, Elizabeth Mosser is the perfect example. She admittedly overpaid her debt in 2016-2017. No dispute. And she didn't get a check. No dispute. The defense says that she got credits to other debts, or other accounts, right? That was Angela Monger, Your Honor. I have a defense that Great Lakes paid people like her the extra money she ended up owing out of their own reserves after they found that situation out. Are you contending there's just no proof of that? So what they allege is that they concede that she overpaid before they remediated, okay? They concede that her debt was too high at that time that she overpaid. Then they remediated, and they add all this other stuff in, the debt goes up. We raised heck about that, because they had told the court that people like her got checks. And the response was, well, don't worry about the delinquency. We're covering it. None of that has to do with whether she was ever remedied for the original harm. And the same logic applies to people who are still indebted. This court's case in Bible made very clear that compensable damages include the increase in the total amount owed. If I have an increase in the total amount I owe on my student debt as a result of negligence, I'm entitled to, according to Bible, cash or account credit. What did this court mean when it said account credit? Did it mean recalculate the debt without the challenged negligence, or in that case, breach of contract, but then increase it for some other reason that is just highly speculative, never litigated, never pleaded? Or does it mean the plaintiff was entitled to a personal financial benefit, meaning I'm here today financially. I'm only here today financially because they harmed me with their illegal conduct. Therefore, I'm entitled to be brought back down here at my debt level. So I guess I'm just trying to understand. So the plaintiff, what you want is, with regard to the $6.6 million, is you want that to the extent those are additional obligations, you want those erased. That is, if we concede that the remediation provided a $22 million actual benefit to the class, our view of that, and we don't concede that because Great Lakes came and said, actually, we didn't record the loan balance changes at all. But let's just say, in an imaginary world where we conceded that issue, our view of that $6 million would be it's a shortfall between what we were entitled to as damages and what they gave us. I don't care why there was a shortfall. You can tell me it's CR 2785. You can tell me I took out another loan that I never took out. You can tell me whatever you want. And if you don't have to prove it's correct, then I'm still out $6 million for no reason. Thank you, Mr. Harris. Thank you. All right. We have Mr. Schreiner. Yes, Your Honor. Good morning. I have pleased the court. Let me get right to what Judge Hamilton properly took us to, which is damages. By the way, the claims of negligence have never been adjudicated. Negligence has been contested. And that's what a couple of the experts who we didn't get to talked about. So the question here is damages. Our defense, if you want to look at that, is sort of a defense of payment. It's a defense that we've fully remediated any harm, even if we were negligent in doing so. 2785, Your Honor, is the one that Mr. Harris interprets to say a different thing than we interpret it to say. But as a student loan servicer, we did what the Department of Education told us to do. Ultimately, after several rounds of what do you want, they said we want you to go back on the back-to-back forbearances and remove the capitalizations that you put on there and associated interest from those capitalizations. This is years after the event. You're quite right, Judge Lee. Originally, we said, well, let's just take them out. And if that had happened, we wouldn't have had the consequences of future protocol changes in the department. The department said, no, we don't want you to do that. Actually, what they said is you can do that if you want to, but it would take us 18 months to approve it. And we wanted to get on with it. So we did what the department told us to do, which was to go back, go back to the time of the capitalizations, remove them, remove the interest, and then run the thing forward, with the proper amounts of capitalization, with the proper amounts owed. And Mr. Treynor, when the department told you that, that is, when CR 2782 and later on the department's authorization to Great Lakes to implement change request 2782, when that took place, had all of the erroneous capitalization that are at issue, had those stopped, or were those still ongoing? Yes, they had. They had because, again, we did what the department told us to do. They said, going forward, don't do this anymore. This way. Do it this way. So we did. So let me just turn to the question of the ground on which the district court ruled in our favor. Well, if I could just put a pin on that. Yes, sir. So CR 2782 was issued in September of 2014. Yes. DOE authorized Great Lakes to implement it in November of 2015. So by that time, this was after all of the alleged erroneous capitalizations had taken place. That's right. OK. OK. Now, this is a case with respect to damages. Our defense has remediated the accounts. We removed the capitalizations and all the interest attributable to them. And that was proved, and this is just, you can read Judge Peterson's opinion. He understood it. This was proved by testimony and affidavits of competent employees, witnesses of Great Lakes on what the methodology was and how they did it, and that the protocols of the department and the student loan service or business were followed. That is, they removed the caps and interest on all the accounts they were still servicing. Done. That's the great majority of the accounts. Through the department, they also, and this is in evidence, they also notified the new servicers, to whom sometimes these things are transferred, that's just part of the business of student loans, of the remediated balances with instruction to bring those into conformity. And there are several forms of communicating such information, and the usual ways were followed. That's what the evidence was. With respect to loans that had been repaid already, and there were some, told the Department of Treasury to send the, what we call the PIFT, paid in full overpayers, a check. Again, that's the usual way this is done. This isn't something that has never happened before. And Deloitte, by the way, confirmed that the Treasury did on the accounts that it looked at, the 1,800 in the sample. Great Lakes itself paid any overpayers on its own that it discovered later on whose increases came from either lots of different things. The subsidy that they were no longer qualified for, and also Great Lakes always had a policy of not capitalizing if the amount of the capitalization was less than $15. Department of Education said, nope, can't do that going forward. And so there were some of those involved in there. But either by check or by credit to another account. And, of course, that credit check, first of all, the Treasury education regulations require us to not send a check when there's another account with an outstanding balance. We credited it. That's all established on the record. Mr. Schreiner, can I ask you a quick question? I'm glad you mentioned the defense of payment because with all the swirling and the briefs I've been trying to follow this, and I had reached towards the affirmative defense of payment in the form of your remediation plans. So just procedurally, so that I understand this, would you agree what we've got is an affirmative defense of payment and then, in essence, a motion for summary judgment saying we've proved it and plaintiffs are arguing that what you've said is legally insufficient, legally irrelevant, but we're not factually disputing it? Right. I think that's what we have. That's a way of looking at it. You know, we're still – we litigated this whole case on the original 2015 complaint even though it asserted a violation that was corrected immediately. That was a computer error. The plaintiff never amended the complaint. We supplemented our answer at one point in the case. And it has always been our position that we were told to fix it and we fixed it. And Judge Peterson appropriately found that we did. But we get to this, to me, the more interesting question that, you know, the district court is struggling with at the end, which is this $6.6 million. And, you know, this public policy – the public policy factors and weighing and trying to figure out which way that goes. And how do the public policy factors weigh in favor of not finding you responsible for that additional sum? Let me start, first of all, by reminding the court of what my friend did when this issue came up earlier in the case about the protocols and the results of the protocols. I think we're assuming the 6.6 was largely the result of following the protocols. It said – because we said, well, they still had not had a damages class certified. We were still opposing the damages class certification. And we raised a 23B3 predominance argument, sort of like Comcast, right? Assuring – and my friend assured the court on behalf of the plaintiff class that these new department-mandated servicing protocols had nothing to do with the merits claim or defenses in this action, as they were beyond the scope of this action. And then relying on those assurances, the court granted certification of damages issues, explaining that with that concession, with that bargain that he struck with the court, individualized issues would not predominate because Great Lakes would not need to justify all the other department-mandated adjustments that it made in the course of the mediation. Now, that is enough, it seems to me, the concession that he said that's not in the case. It's not in this case. But to get to your question, Judge Jackson-Akumi, about public policy, basically our public policy tort law. We didn't follow Paul's graph. We followed the dissent. So doctrinally, we don't have a doctrine that is followed in most states. But we've come to the same thing through these public policy state law and this is a state law claim. Public policy points, which are, again, laid out in Judge Peterson's opinion, you don't, a legal cause, that's what we call it in Wisconsin, it has to be a legal cause. And the legal cause excludes things that are attenuated, that are far removed, that it would be unfair to stick on the alleged tort fees, and he went through and explained why those applied in this case. We didn't know at the time we allegedly committed our tort of improperly capitalizing interest that the Department of Education was going to require us to do it in this way incurring those things. But that's why I asked about the timing, right? Yeah. Because, you know, I noticed that the class period is 2006 through 2019, right? So there's some timing. I'm not sure when it was starting early. And yet what you're saying is that these improper capitalizations ceased prior to November of 2015. Absolutely. Okay. And so why do you know, why was the class extended beyond the time that the capitalization started? I don't know the extent. I thought it was pleaded until the time of trial. I don't remember what the original pleading of the class period was, but simply because the case was still going, I guess. But there is no evidence, none whatsoever, that these so-called improper capitalizations, which, by the way, we still think we were doing things the right way at the day. And the day, another aspect that would be interesting if this case had ever gone to trial was how did the plaintiff going to prove the standard of care of a student loan servicer responding to the Department of Education's instructions. We had a couple of experts on liability who said what they did was perfectly proper. It was perfectly reasonable under the circumstances. Nothing on the other side about that. So this is a case that I think for a long time has been headed for where it ended up. And Judge Hamilton, you're exactly right. Judge Peterson's an experienced district judge. He wanted to know what's this trial going to be like? They've got expert witnesses. You don't have anybody. What are we going to bring the jury in here and tell them to do with respect to damages? And my friend, you know, he had opportunities to take further discovery, to take further depositions. He didn't. He just basically said, I'm done. And I've got legal arguments now. And it's a minus B equals C. And we know that isn't a proof of damages. And in fact, the full remediation that was accomplished here, established in the record, took care of everything that is a consequence of the alleged negligence with respect to capitalizations of interest. Mr. Schreiner, going back to a question that Judge Hamilton asked you with regard to the repayment, what evidence do your clients have that the checks were actually issued or the credits actually made? In other words, I know that you requested that DOD do certain things and you requested that your successor and interest servicers do certain things. And didn't plaintiff present some evidence that some of the class members didn't get the refunds that they were entitled to? He's got two in addition to his client. And his client, by the way, is fully explained. I'm sorry. Can you answer the first one and then the second? Yeah. Well, the evidence is that, first of all, in the supplemental report of Mr. Bankhead, he looked at those accounts and said that he found proof that it was done. Judge Peterson indulged a common presumption, and I think he may have even used this comparison. You put a letter in the mail, you presume it was delivered. We use that all the time in the law. We follow the usual protocols for what we do when we need to have the government issue, the treasury issue a check, when we have a successor servicer know that we've adjusted the balances on the account that they took over. That's the proof. It's good, solid evidence. I thought Bankhead went further than that, though. And they had access to treasury databases and communicated with the other servicers and confirmed, at least for their sample, they were, in fact, issued, and his exceptions that he had initially found were resolved. Right. Exactly. So to me, there's just no evidence. That's what Judge Peterson said. What's your evidence against the defendant's evidence? And the answer is pretty much what you heard here today. Nothing. So I think that's basically what I have to say. A lot of other things I could say. Could I ask you, Mr. Schreiner, briefly, there were some points made in the reply brief that I don't know that you had an opportunity to address yet. One was the spoliation argument. Yeah. What is spoliation? First of all, never raised in the district court. I don't know what that is. I really don't know what he's talking about. He's suggesting that somehow, and again, it gets back to this concession he made to Judge Peterson, and he said it in just these terms that the defendants are not liable for explaining all of the other matters, the consequences of the department's protocols. He wants us, again, violating the whole 23B3 thing, to be able to go through each account and say what happened in each account and give a balance on a given day. That defeats the whole purpose of litigating damages on a class basis. The reply brief also brought up Ms. Mosser's situation.  We think she got the check. We think the evidence shows that she did get the check. She apparently told him she didn't. I don't know. Ms. Minder is the one who had the account balance adjusted on the other account. I have to say it's been a long time since I've heard a lawyer suggest that the district courts are stacking the deck against the I think that's unworthy. There's no evidence of that. That's his view, and when you lose cases, sometimes you imagine all sorts of things. But that's an amazing position to be taking. I want to dissociate myself from anything along those lines here. Again, there is no proof. Thank you, Your Honor. Thank you, Mr. Shriner. Mr. Harris, we'll give you your three minutes. Thank you, Your Honor. One thing I'd like to supplement, I guess, with oral argument today is the court is obviously focused on, to some degree, this question of how the facts, as they appear, line up with the elements or the affirmative defense of payment. How do we map this set of facts as they evolved over time to what the law is? And so that kind of goes to our argument about the confusion of the elements, the element of breaching a duty, the element of causing harm in the first place, and then the separate issue, the affirmative defense or the affirmative defense of payment or the legal doctrine of a remedy. What is a remedy for harm? Apart from those issues, let's say this court decides there was admissible, genuinely undisputed evidence of a legally sufficient remedy, mid-litigation, for the harm that was caused. We still have this collateral source issue, and Great Lakes' main point on that is... Your point is that Great Lakes doesn't get credit if refunds were issued by Treasury or by other servicers? Yes, Your Honor. That's our position. That's astonishing. Okay. So if we look at docket numbers... Could I ask you to address Mr. Schreiner's point about the concession made to obtain class certification? Yeah, the district court... The various other adjustments were not part of the case? Sure, and I would ask the court to go back and look at our brief that the district court responded to in its order because my position, respectfully, is that the district court switched what we were arguing to make a different point than what we were making in our brief. How so? So our point was that Great Lakes cannot use other adjustments to offset their liability for the damages we had proven. And the district court took that argument and said, well, what they're really trying to do is recover damages for those other things. Our position is, no, that's not what we're trying to do legally. They are trying to use other adjustments as an offset to damages. No, the question for class certification is about individual issues predominating, correct? Yes, Your Honor. And the district court recognized in that vein that there's no precedent for declining to certify a class because a defendant essentially does individual things in response to a case. Right. Because any class could be defeated by a defendant using a random number generator to redress the harm. And that's essentially what happened here is our position. Random number generation? Yes, Your Honor. We believe that what actually happened here was not good faith efforts at compliance with other adjustments that were never litigated. And the evidence of that? The evidence of that, along with your evidence of bias in the district court? Sure. So, Your Honor, we would say that the evidence shows that there may have been technical errors in the remediation. What evidence? And so that would be the second 30B6 deposition of Great Lakes, which was at docket 227 below. And we touched on some of that testimony in our brief where what they had testified was all we did was back off the wrongful transactions. We did nothing else. But then I have Mosser coming to me saying, I was paid in full, and now I'm in delinquency. So I knew that Great Lakes' testimony was impossible. I knew it was impossible that all they had done was reduce the debts by removing the capitalizations. And so I deposed Great Lakes. And I asked them, hey, is it possible that when you rebuilt these accounts on your very own, the system applied new and different algorithms than what had been used to calculate the debt historically? And she's like, yeah, I guess that could have happened. There wasn't some deliberation of, oh, now we need to comply with CR 2785, so now we're going to go in and do some separate procedure. The government at docket 165, it's undisputed. That's a declaration from Great Lakes. The government gave Great Lakes a choice on how to remediate. The government said, you can do an account credit, a straight debt reduction, formula-based. We'll have to review it. But we're not opposed to that. Great Lakes said, well, we don't want to wait. So can we just do this account rebuilding thing instead, where it's not necessarily an account credit. It's a total technological makeover of the debt. And the government said, yeah, go ahead and do that. That's totally outside the scope of this case. Great Lakes alone made the decision of how to provide a remedy. And the route that they chose led to very bad financial results from the class. They could have chosen a legally sufficient remedy, which would have been a straight account credit, formula-based debt reduction. All right.  Thank you. We will now move on.